OPINION
{¶ 1} Appellant, Mark A. Worley, appeals from the judgment of the Trumbull County Court of Common Pleas, finding him guilty of aggravated murder of Dorothy M. London ("Mrs. London"), murder of Charles A. London ("Mr. London"), kidnapping, aggravated robbery, and aggravated burglary following a jury trial. For the following reasons, we affirm.
{¶ 2} By way of background, Mr. London, seventy-five years old, and Mrs. London, seventy-four years old, resided on Broadway Avenue in Hubbard Township, Trumbull County. Scott Burrows ("Burrows") lived next door to the Londons, and was also a friend of appellant.
{¶ 3} At approximately 4:00 p.m., Thursday, December 16, 1999, Paul London ("Paul") attempted to contact his parents by telephone. Because there was no response to his phone calls, Paul contacted his sister, Carol London Nuth ("Carol"). After Carol unsuccessfully attempted to reach her parents by telephone, she contacted Beverly Donnan, ("Ms. Donnan"), a neighbor of the Londons and asked her to check on her parents. Carol subsequently received a phone call from Ms. Donnan urging her to come to her parent's house because something bad had happened.
{¶ 4} Soon thereafter, officers from the Hubbard Township Police Department arrived at the Londons' residence to find Mrs. London dead on the bathroom floor and Mr. London missing from the residence. Law enforcement also learned that a number of firearms, including a bow and arrow, were missing from the residence, along with the Londons' vehicles, to wit: a 1996 Ford Crown Victoria and a 1984 Pontiac Parisienne.
{¶ 5} On December 17, 1999, Trooper Richard Baron ("Trooper Baron") of the Ohio State Highway Patrol, located Burrows in the Crown Victoria at a rest area on State Route 11 in Ashtabula County. Numerous firearms, including a pellet gun, bow and arrows, and shotgun shells, were found in the Crown Victoria. Burrows was subsequently arrested in connection to the London murders.[1]
{¶ 6} On December 16, 17, and 18, 1999, appellant was seen driving the Pontiac Parisienne belonging to the Londons. In the early morning hours of Sunday, December 19, 1999, appellant parked the Pontiac in Mill Creek Park, left the keys in the vehicle and locked the doors.
{¶ 7} Later that morning, the Mill Creek Police Department discovered the Pontiac. Detective Donald M. Begeot ("Detective Begeot") of the Hubbard Township Police Department discovered copious amounts of blood in the trunk of the vehicle. A pair of white gloves with a reddish-brown stain consistent with blood, a credit card belonging to Mr. London, a serrated steak knife, and a BB gun were also found in the vicinity of the vehicle.
{¶ 8} In the afternoon hours of December 19, 1999, law enforcement converged on a residence located at 906-1/2 West Indianola Avenue, Youngstown, Ohio, where they believed appellant was staying. At approximately 2 p.m., appellant was arrested pursuant to an arrest warrant for grand theft of a motor vehicle. While in custody, appellant was advised of his Miranda rights several times. He subsequently provided three separate statements.
{¶ 9} On December 22, 1999, Mr. London's body was recovered from the Mahoning River near the West Avenue Bridge. Law enforcement discovered drag marks and blood near the bridge, which was later shown to belong to Mr. London.
{¶ 10} In the months following the investigation, Paul, the victims' son, went to pick up the Pontiac at the Hubbard Township Police Department. While cleaning the vehicle, Paul discovered a serrated steak knife behind the front passenger seat and a knife sheath underneath the driver's seat.
{¶ 11} Subsequently, on December 28, 1999, the Trumbull County Grand Jury indicted appellant on one count of aggravated murder in the death of Mr. London, in violation of R.C. 2903.01(B) with three specifications of aggravating circumstances, to wit: R.C. 2929.04(A)(5), (A)(7); one count of aggravated murder in the death of Mrs. London, in violation of R.C. 2903.01(B) with four aggravating circumstances, to wit: R.C. 2929.04(A)(3), (A)(5), (A)(7); one count of kidnapping of Mr. London, in violation of R.C. 2905.01(A)(2), (3); one count of aggravated robbery of Mr. London, in violation of R.C. 2911.01(A)(1), (3); one count of kidnapping of Mrs. London, in violation of R.C. 2905.01(A)(2), (3); and one count of aggravated burglary of the Londons' residence, in violation of R.C. 2911.11(A)(1), (2).
{¶ 12} Due to a conflict of interest with the Trumbull County Public Defender's Officer, Attorneys James S. Gentile and Louis M. DeFabio were appointed to represent appellant. Appellant subsequently entered a plea of not guilty to all the charges. Then, on August 2, 2000, appellant filed a motion to suppress his statements of December 19 and 20, 1999. The trial court held a hearing, and in a lengthy judgment entry issued on October 30, 2000, the court denied the motion to suppress. The matter proceeded to trial by a jury.
{¶ 13} After a seven day trial, on March 14, 2001, the jury returned a verdict of not guilty on the charge of aggravated murder of Mr. London but guilty of the lesser-included offense of murder, in violation of R.C. 2903.02. Appellant was found guilty of the aggravated murder of Mrs. London as to three of the aggravating circumstances set forth in R.C. 2929.04(A)(3) and (A)(7). As a result, appellant was found not guilty of the aggravating circumstance specified in R.C. 2929.04(A)(5), to wit: committing aggravated murder as part of a course of conduct involving the purposeful killing of two or more persons. As to the remaining charges, that is, kidnapping of Mr. and Mrs. London, aggravated robbery of Mr. London, and aggravated burglary of the Londons' residence, the jury returned guilty verdicts.
{¶ 14} Upon completion of the mitigation phase as to the aggravated murder of Mrs. London, the jury recommended that a sentence of life imprisonment without parole be imposed on appellant. On March 27, 2001, appellant was ordered to serve a life sentence without parole for the aggravated murder of Mrs. London, fifteen years to life for the murder of Mr. London, and ten years for each of the remaining four counts to be served consecutively to each other.
{¶ 15} Appellant now appeals his conviction, advancing five assignments of error with numerous subissues for our review:
 {¶ 16} "[1.] The trial court erred by denying appellant's motion to suppress statements made to the police officers while in custody in violation of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 14 and 16
of the Constitution of the State of Ohio.
 {¶ 17} "[2.] The trial court erred by allowing the prosecution to use incriminating evidence obtained in violation of the appellant's constitutional rights protected by the Fourth and Fourteenth Amendments of the United States Constitution and Article 1, Sections 14 and 15 of the Constitution of the State of Ohio.
 {¶ 18} "[3.] The trial court erred in denying the appellant the right to a fair and impartial jury in violation of the Sixth and Fourteenth Amendment[s] to the United States Constitution and Article I, Sections 14 and 16 of the Constitution of the State of Ohio by allowing the prosecuting attorney to engage in a pattern of misconduct intending to inflame the passions of the jury[.]
 {¶ 19} "[4.] The trial court erred to the prejudice of defendant-appellant by denying defendant-appellant due process of law and effective assistance of council [sic] in violation of the Ohio and United States Constitutions where the trial counsel fell below an objective standard of reasonable representation.
 {¶ 20} "[5.] The trial court erred to the prejudice of the defendant-appellant in convicting him against the manifest weight of the evidence."
{¶ 21} In the first assignment of error, appellant presents two separate issues challenging the denial of his motion to suppress statements made on December 19 and 20, 1999. We will address each one in turn.
{¶ 22} At a hearing on a motion to suppress, the trial court functions as the trier of fact. As such, the trial court is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of witnesses. State v. Mills (1992),62 Ohio St.3d 357, 366; State v. Smith (1991), 61 Ohio St.3d 284, 288;State v. DePew (1988), 38 Ohio St.3d 275, 277; State v. Fanning (1982),1 Ohio St.3d 19, 20.
{¶ 23} On review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.State v. Retherford (1994), 93 Ohio App.3d 586, 592; State v. Guysinger
(1993), 86 Ohio App.3d 592, 594; State v. Klein (1991), 73 Ohio App.3d 486,488. After accepting such factual findings as accurate, the reviewing court must independently determine as a matter of law whether the applicable legal standard has been satisfied. Retherford at 592; Klein at 488.
{¶ 24} The following facts were adduced at the suppression hearing concerning appellant's arrest and subsequent statements concerning his involvement in the London murders.
{¶ 25} According to Detective Begeot, the lead investigator, an arrest warrant for grand theft of a motor vehicle was issued for appellant on Saturday, December 18, 1999. Apparently, Detective Begeot was informed that appellant's brother, Michael, knew appellant may have been staying at a friend's apartment located on 906-1/2 West Indianola Avenue, Youngstown, Ohio. The owner of the residence was Sally Huddleston, and appellant had apparently spent the night.
{¶ 26} In the afternoon hours of December 19, 1999, with the warrant, law enforcement officials entered the West Indianola Avenue residence. Appellant came out of a bedroom with his hands up and was handcuffed outside of the bedroom.
{¶ 27} After 3 p.m. on December 19, 1999, appellant was taken to Hubbard Township Police Department and mentioned that he was hungry. As a result, Detective Begeot and Trooper Baron ordered a pizza and soft drinks. Appellant, along with Trooper Baron and Detective Begeot, ate in the squad room area, and appellant was permitted to use the rest room and have a cigarette. During this time, appellant was not asked any questions concerning the crimes.
{¶ 28} At approximately 4:15 p.m., Detective Begeot advised appellant of his Miranda rights. A waiver of rights form was read to appellant, which he signed. Appellant indicated that he was willing to speak to Trooper Baron and Detective Begeot and was subsequently interviewed for approximately thirty minutes. During this time, Detective Begeot recalled Trooper Baron saying to appellant that he was being given an opportunity to tell his side of the story:
 {¶ 29} "Q. Do you recall Trooper Baron using the words to the effect of, you know, why don't you [appellant] tell us your side of the story?
{¶ 30} "A. I believe he did, yes.
{¶ 31} "Q. Tell me what he said in reference to that.
{¶ 32} "A. What who said?
{¶ 33} "Q. Trooper Baron?
 {¶ 34} "A. Just that, we would, we would like to hear his version of what occurred at the London home that night because we felt that he was involved.
{¶ 35} "Q. Okay.
 {¶ 36} "A. And that he was being given an opportunity now to tell his side of the story.
{¶ 37} "* * *
 {¶ 38} "Q. So after Trooper Baron says, you know, we're giving you [appellant] an opportunity to tell your side of the story suddenly — I shouldn't say that. What happens next?
 {¶ 39} "A. Obviously at some point in time Mark begins to confess that he has more involvement than he initially had indicated." (Emphasis added.)
{¶ 40} Apparently, after Trooper Baron told appellant to tell his side of the story, appellant began to cry. At that point, the officers tried to calm appellant by telling him that everything was going to be okay:
 {¶ 41} "Q. After Mr. Worley cries, is anything else said by either you or Trooper Baron before he starts giving more details about the events of that week?
 {¶ 42} "A. It was obvious at that point that Mark had more to tell us. I think that was the reason he broke down, because he knew more, and he had indicated that he had additional information.
 {¶ 43} "After we calmed him, told him it was going to be okay, calm down, Mark began to relate the events that had taken place the evening of December 15th and into December 16th, and the days following up until his arrest." (Emphasis added.)
{¶ 44} Thus, after initially denying any knowledge about the events surrounding the death of the Londons, appellant admitted his involvement. At that point, Detective Begeot began videotaping appellant's statement.
{¶ 45} The videotaped interview began on December 19, 1999 at 4:45 p.m. and ended at 5:54 p.m., or approximately one hour and nine minutes.[2] At the beginning of the interview session, Detective Begeot again advised appellant of his Miranda rights. Appellant indicated that he understood his right, did not have any questions, waived his rights and consented to make a statement. Detective Begeot also confirmed that appellant was not mistreated while in custody:
 {¶ 46} "Detective Begeot: * * * Throughout this time has anyone deprived you, Trooper Baron or myself or anyone else associated with the police department deprived you of anything?
{¶ 47} "[Appellant]: No.
{¶ 48} "Detective Begeot: You are in fact fed.
{¶ 49} "[Appellant]: Yes.
 {¶ 50} "Detective Begeot: And treated cordially. Has anyone mistreated you?
{¶ 51} "[Appellant]: No.
 {¶ 52} "Detective Begeot: Or hurt you or threaten you in any way.
{¶ 53} "[Appellant]: No."
{¶ 54} Appellant then made his first statement to Detective Begeot. According to appellant, Burrows talked him into robbing the Londons' residence. At approximately 7 p.m., Wednesday, December 15, 1999, appellant and Burrows stopped at the Hubbard Church of the Nazarene, and subsequently left between 7:15 and 7:20 p.m. From there, appellant and Burrows went to the railroad tracks off of Mt. Everett. According to appellant, Burrows drove the black pick-up truck back into the woods and parked it. The pair then left the truck and walked to Bellwick Bowling Alley to get a cup of hot chocolate. They remained in the bowling alley for a few minutes, and then walked to the Londons' residence. Appellant stated that Burrows had pointed out this house to him before.
{¶ 55} At approximately 8 p.m., the pair arrived at the Londons' residence and Burrows knocked on the door. According to appellant, when Mr. London answered, Burrows asked Mr. London if he could take them back to the pick-up truck because it was having mechanical difficulty. In fact, there was nothing wrong with the vehicle.
{¶ 56} Mr. London drove the Pontiac Parisienne while appellant was seated in the front, and Burrows was seated directly behind Mr. London in the back seat. The trio traveled to the railroad tracks off of Mr. Everett. At that point, Burrows allegedly pulled out a BB gun, ordered Mr. London out of the vehicle, and to hand over his wallet.[3] Burrows then ordered Mr. London to lay down on the ground. After Mr. London complied, appellant claimed that Burrows pulled out a straight knife, held Mr. London down and proceeded to stab him in the chest, back and throat. With Mr. London's body in the trunk of the Pontiac, appellant and Burrows drove back to the Londons' residence.
{¶ 57} Upon arriving at the home, Mrs. London let the pair in after she was told that her husband was in the garage. Then, according to appellant, Burrows pulled out a BB gun and forced Mrs. London towards the bathroom. In the bathroom, appellant claimed that Burrows held Mrs. London down and stabbed her in the back, chest and throat while he stood "behind [Burrows] watching because [he] didn't want part of the murders." After Mrs. London was dead, the pair obtained several weapons from a gun cabinet, including compound bows, and placed these items in the back seat of the Pontiac. Appellant also stated that Burrows took a phone that was hanging on the wall in the kitchen.
{¶ 58} When the pair left the Londons' residence, appellant was driving the Pontiac while Burrows drove the Crown Victoria. They proceeded back to the railroad tracks off of Mt. Everett to unload the guns and hide them in the bushes. Between 9-10 p.m., appellant and Burrows went to the West Avenue Bridge, removed Mr. London's body from the trunk of the Pontiac, dragged him approximately 20-25 feet and tossed the body over the bridge into the Mahoning River.
{¶ 59} In order to dispose of the Londons' vehicles, appellant and Burrows went to see Diamond Carpeck to inquire as to whether he knew of any chop-shops. Appellant and Burrows unsuccessfully attempted to locate a chop-shop until 3 a.m., Thursday, December 16, 1999.
{¶ 60} The pair then traveled to the Tally-Ho Hotel in Liberty, Ohio, where Burrows rented a room with money from Mr. London's wallet. According to appellant, they checked out of the hotel after 11 a.m. on Thursday, December 16, 1999. From there, they visited with several people and spent time at the Southern Park Mall and Liberty Plaza.
{¶ 61} At 5:34 p.m., there was a break in the interviewing process so appellant could use the restroom facilities and have a cigarette. The interview resumed at 5:37 p.m., and appellant smoked during the remainder of the interview.
{¶ 62} At this point, appellant continued his statement by explaining that in the early morning hours of Sunday, December 19, 1999, he parked the Pontiac off the tree line in Mill Creek Park, left the keys in the vehicle and locked the doors. In this area, appellant also disposed of his pellet gun, his white gloves, a serrated steak knife, and Mr. London's credit card. According to appellant, there was blood on the gloves. As for the serrated steak knife, appellant claimed that he obtained it from the Londons' residence; however, he denied using the knife on Mr. or Mrs. London. After disposing of the Pontiac, appellant returned to 906-1/2 West Indianola Avenue and went to sleep.
{¶ 63} At the end of the first interview, appellant confirmed that he had voluntarily waived his Miranda rights and consented to speak with the officers:
 {¶ 64} "Detective Begeot: Okay, you've been Mirandized.
{¶ 65} "[Appellant]: Yes.
 {¶ 66} "Detective Begeot: You had them read to you not once but twice.
{¶ 67} "[Appellant]: Yes.
 {¶ 68} "Detective Begeot: You understood those Rights.
{¶ 69} "[Appellant]: Yes, I did.
 {¶ 70} "Detective Begeot: You voluntarily waived those rights and consented to speak to Trooper Baron and I, correct.
{¶ 71} "[Appellant]: Yes.
 {¶ 72} "Detective Begeot: In fact, you told us what happened to the best of your recollection of Mr. and Mrs. London.
{¶ 73} "[Appellant]: Yes."
{¶ 74} At that point, the first interview terminated at 5:54 p.m. However, a few minutes later at 6:11 p.m., appellant was put back on videotape for approximately thirteen minutes, and asked additional questions to clarify some points. Prior to the questioning, appellant acknowledged that he had waived his Miranda rights, agreed to speak with the police officers and was being treated well:
 {¶ 75} "Detective Begeot: * * * First, you have been advised of your rights at least twice this evening, is that correct.
{¶ 76} "[Appellant]: Yes.
 {¶ 77} "Detective Begeot: You understood those rights.
{¶ 78} "[Appellant]: Yes.
 {¶ 79} "Detective Begeot: And you, in fact, have waived those Rights of your accord and agreed to speak with Trooper Baron and I, correct.
{¶ 80} "[Appellant]: Yes.
{¶ 81} "Detective Begeot: Nobody threatened you.
{¶ 82} "[Appellant]: No.
 {¶ 83} "Detective Begeot: Nobody has harmed you in anyway, is that correct.
{¶ 84} "[Appellant]: Yep.
 {¶ 85} "Detective Begeot: In fact, you [have] been permitted to use the restroom and you consumed water and pop and in fact, we bought pizza and we all shared pizza together, is that correct.
{¶ 86} "[Appellant]: Yep.
{¶ 87} "Detective Begeot: Are you comfortable?
{¶ 88} "[Appellant]: Yes.
 {¶ 89} "Detective Begeot: You have no problem with us recording some additional questions that we need to clarify with you, right.
{¶ 90} "[Appellant]: No."
{¶ 91} At that point, Trooper Baron commenced the second interview. During the interview, appellant stated that after Mr. London was dead, there was no conversation between him and Burrows when they drove back towards the Londons' residence. According to appellant, he wore gloves to avoid detection and used them when he had contact with Mr. London's body. Again, appellant denied having any contact with Mrs. London's body.
{¶ 92} Finally, appellant stated that he was willing to show the police officers where Mr. London was murdered, where his body was disposed of, and take a polygraph exam to confirm his version of events. At 6:24 p.m., Sunday, December 19, 1999, the second interview ended.
{¶ 93} Thereafter, appellant signed a consent form to have the Hubbard Township Police Department transport him to the site where Mr. London was killed and where his body was left. That same Sunday evening, appellant directed Agent Saraya, Detective Begeot, and Trooper Baron to a set of railroad tracks near Mt. Everett Road where Mr. London was killed and his body subsequently loaded into the trunk of the Pontiac. At the scene, Detective Begeot discovered blood in the gravel. Appellant also showed Detective Begeot where the black pick-up truck was located. From there, appellant directed the police officers to the West Avenue Bridge in Youngstown, Ohio where Mr. London's body had been removed from the trunk of the Pontiac, dragged out onto the bridge deck and thrown over the side into the Mahoning River.
{¶ 94} After touring these locations, appellant was transported to the Trumbull County Jail where he arrived at approximately 10:20 p.m. Detective Begeot indicated that he left appellant prior to 11:00 p.m.
{¶ 95} Early the following morning, Monday, December 20, 1999, a polygraph exam was arranged to verify certain information appellant had provided to Detective Begeot and Trooper Baron. According to James Teeple ("Investigator Teeple"), an investigator with the Trumbull County Prosecutor's Office, appellant arrived at approximately 8:20 a.m.
{¶ 96} Upon arrival, Investigator Teeple had appellant's restraints removed and asked if he wanted a cup of coffee. After being advised of his Miranda rights, appellant indicated he understood his rights and was willing to waive his rights and speak with Investigator Teeple. Appellant signed the waiver of rights form at 8:30 a.m., and also signed a consent form to take a polygraph exam at 9:10 a.m.
{¶ 97} During their conversation, appellant mentioned to Investigator Teeple that he had about two hours of sleep the night before. According to Investigator Teeple, appellant explained that "he was tired but his eyes wouldn't close * * *." Appellant also indicated that he had something to eat that morning. There was no indication that appellant's lack of sleep was due to anything other than appellant's own inability to sleep.
{¶ 98} Prior to giving his third videotaped statement, Investigator Teeple asked appellant if he had forgotten or left information out of his prior statements. At that point, appellant indicated that he had to clarify some points. Investigator Teeple testified to the following conversation with appellant:
 {¶ 99} "Q. Now, you didn't give [appellant] a polygraph exam?
{¶ 100} "A. No, I didn't.
{¶ 101}"Q. Would you explain to the Court why?
 {¶ 102} "A. Well, prior to the examination we were going over the questions and everything, he
[appellant] said that there was some things that he did not tell the police the night before and he wanted to tell me about those and clear that up.
 {¶ 103} "Q. What did he want to clear up? What exactly did — whether he was personally involved in killing the victim; is that correct?
{¶ 104} "A. That's correct.
{¶ 105} "Q. Would you tell the Court what changed?
 {¶ 106} "A. Well — whenever — there was, a few things changed. The story about Mr. London did not change. But then after they loaded Mr. London's body in the trunk then they had a conversation about having to go back and kill Mrs. London because she saw their faces. * * *" (Emphasis added.)
{¶ 107} Appellant was then interviewed by Investigator Teeple on videotape for twenty-two minutes, from 9:52 until 10:14 a.m. At the beginning of the videotaped interview, Investigator Teeple read to appellant his Miranda rights and waiver of rights form a second time. At this point, appellant indicated that he was still willing to waive his rights and speak with Investigator Teeple. As a result, appellant signed the waiver of rights form a second time at 9:55 a.m.
{¶ 108} Contrary to appellant's initial statements, he now indicated that after Mr. London was dead, a conversation took place between himself and Burrows about killing Mrs. London because she could identify them:
 {¶ 109} "[Appellant]: Um, he [Burrows] had told me [appellant] that beings that he stabbed Mr. London that he wanted me, he wanted me to stab Mrs. London. We got into a little bit of an argument about it. He kept handing me the knife, and I put it on the seat in between the both of us. He asked me where the knife was when we got back to the house, and I told him that I left it in the car, and he went back and got it * * *. Then, we went back up into the house.
{¶ 110} "* * *
 {¶ 111} "The plan was to go back and I guess kill her [Mrs. London] to [sic] because he [Burrows] didn't want anything with the police involved because we weren't masked. So, I mean she would have been able to identify us.
{¶ 112} "* * *
 {¶ 113} "[Teeple]: Okay. When you loaded Mr. London in the * * * trunk of his car and came back, did you know for sure Mrs. London was going to be killed when you were heading back to their house?
{¶ 114} "[Appellant]: Yes, I did.
{¶ 115} "[Teeple]: How did you know that?
 {¶ 116} "[Appellant]: Because [Burrows] had said that we had to kill her because she saw our faces."
{¶ 117} Furthermore, contrary to his initial statement, appellant now admitted that he went to an ATM machine with his friend Kathy and attempted to retrieve money from Mr. London's credit card.
{¶ 118} And, while he previously denied any involvement in Mrs. London's murder, appellant stated to Investigator Teeple that he held Mrs. London down while Burrows stabbed her. He also admitted to stabbing Mrs. London several times while Burrows restrained her:
 {¶ 119} "[Appellant]: Um, after [Burrows] had had Mrs. London laying down, he said that he dropped the knife that he was using and that he needed another one. He told me to go into the kitchen and find one. I went into the kitchen and the first drawer that I opened was a drawer with a bunch of silverware, and I took a steak knife from inside the drawer and I took it back to him.
{¶ 120} "* * *
 {¶ 121} "It was a serrated steak knife with a dark wood, wood handle.
{¶ 122} "* * *
 {¶ 123} "I took it [the serrated steak knife] back to [Burrows] and I handed it to him.
{¶ 124} "[Teeple]: Then you did what?
 {¶ 125} "[Appellant]: He [Burrows] had talked me into stabbing her.
 {¶ 126} "[Teeple]: Okay, but first while he was stabbing her, where were you?
 {¶ 127} "[Appellant]: I was in the bathroom, um, so that she wouldn't scream. I was holding her mouth closed with my right hand and with my left hand, I was holding her left hand down to the floor.
{¶ 128} "[Teeple]: Okay, while Scott was doing what?
{¶ 129} "[Appellant]: While Scott was stabbing her.
{¶ 130} "[Teeple]: Was she screaming?
 {¶ 131} "[Appellant]: Um, she was trying to but my hand was covering her mouth.
{¶ 132} "* * *
 {¶ 133} "[Teeple]: Muffled, but you had her muffled after that?
{¶ 134} "[Appellant]: Yes.
{¶ 135} "[Teeple]: To keep her quite [sic].
{¶ 136} "[Appellant]: Yes.
 {¶ 137} "[Teeple]: Then after that then Scott handed you the knife.
{¶ 138} "[Appellant]: He handed me the knife.
 {¶ 139} "[Teeple]: And what did you do with the knife?
 {¶ 140} "[Appellant]: I stabbed her approximately 6 or 7 times
{¶ 141} "[Teeple]: Could it have been more?
 {¶ 142} "[Appellant]: It could of been more or it could have been less. I didn't really keep count.
{¶ 143} "[Teeple]: Okay. Why did you do that?
 {¶ 144} "[Appellant]: I think it was the pressure of him saying that he didn't want to be the only one doing this. He didn't want to be alone in this that if he was going down, I was going down with him."
{¶ 145} After stabbing Mrs. London, appellant described how he went into the living room, noticed that the curtains were open and proceeded to close them to prevent anyone from looking into the house.
{¶ 146} Towards the end of the interview, appellant acknowledged that he had been treated well and was advised of his Miranda rights:
 {¶ 147} "[Teeple]: Okay, ah, how have you been treated since you have been here?
 {¶ 148} "[Appellant]: I [have] been treated very well.
{¶ 149} "[Teeple]: Had a cup of coffee.
{¶ 150} "[Appellant]: Yes.
 {¶ 151} "[Teeple]: You were advised of your rights twice. You knew that you could have an attorney. You didn't ask for an attorney. As a matter of fact, you still haven't asked for an attorney is that correct?
{¶ 152} "[Appellant]: Yes it is."
{¶ 153} At 10:14 a.m., the interview ceased. The polygraph exam was never administered to appellant because according to Investigator Teeple, "[appellant] had given [him] the information that [they] were seeking, so it resolved it."
{¶ 154} Having summarized the events of December 19 and 20, 1999, we now consider whether appellant's waivers and subsequent statements were made voluntarily. We will initially address this issue in isolation from the second issue raised concerning any unnecessary delay in producing appellant for his initial appearance.
{¶ 155} Appellant contends that he was incapable of making a knowing, intelligent, and voluntary waiver of his Miranda rights. To support his position, appellant points to his age in that he was only twenty-one years old, not a high school graduate, had a history of mental and emotional problems, was extremely emotional, and had no experience with the type of police interrogation that was conducted in this matter.
{¶ 156} As for the interrogation tactics, appellant claims that he was questioned by Detective Begeot and Trooper Baron for approximately seven hours. According to appellant, Trooper Baron and Detective Begeot made promises to appellant with respect to his cooperation, and they used deception and psychological coercion to procure a statement. For instance, appellant submits that during the interrogation, the officers provided psychological coercion by telling him that "everything was going to be all right", and that they were providing appellant with an opportunity to tell his side of the story. Furthermore, multiple comments were made regarding the use of polygraph examinations.
{¶ 157} "While voluntary waiver and voluntary confessions are separate issues, the same test is used to determine both, i.e. whether the action was voluntary under the totality of the circumstances." (Emphasis sic.) State v. Clark (1988), 38 Ohio St.3d 252, 261. See, also, State v. Foster (Dec. 21, 2001), 11th Dist. No. 2000-T-0033, 2001 WL 1647177, at 7.
{¶ 158} "An express written or oral statement of waiver of the right to remain silent * * * is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case." North Carolina v. Butler (1979), 441 U.S. 369,373.
{¶ 159} "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." Id. Accordingly, the state bears the burden of proving by a preponderance of the evidence that prior to making a statement, the defendant had "voluntarily, knowingly, and intelligently" waived his Miranda rights based on the "totality of the circumstances" surrounding the interrogation. State v. Eley, 77 Ohio St.3d 174, 178, 1996-Ohio-323. See, also, Foster at 7; State v. Nelson (Sept. 24, 1999), 11th Dist. No. 97-L-108, 1999 WL 778374, at 4.
{¶ 160} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Edwards (1976),49 Ohio St.2d 31, paragraph two of the syllabus.
{¶ 161} "A statement is voluntary if it is `the product of an essentially free and unconstrained choice by its maker * * *[.]'" Statev. Wiles (1991), 59 Ohio St.3d 71, 81, quoting Culombe v. Connecticut
(1961), 367 U.S. 568, 602. "A confession is involuntary * * * `if it is the product of `coercive police activity.'" State v. Loza,71 Ohio St.3d 61, 66, 1994-Ohio-409, quoting Colorado v. Connelly
(1986), 479 U.S. 157, 167.
{¶ 162} As noted earlier in this opinion, appellant was amply notified of his constitutional rights numerous times. This is also evidenced by his execution of two waiver of Miranda rights forms and a consent form to the Hubbard Township Police Department's transportation of himself to the site where Mr. London was killed and his body disposed.[4]
{¶ 163} Furthermore, at the commencement of the videotaped interviews, Detective Begeot and Investigator Teeple read to appellant his Miranda rights and waiver of rights form. In each instance, appellant indicated he understood his rights, did not have any questions concerning his rights, waived his rights, and consented to speak with the law enforcement officials. Appellant also acknowledged during the videotaped session that he had consented of his own free will to take the police officers to the sites where Mr. London was killed and where his body was dumped.
{¶ 164} Moreover, at the time of questioning, appellant was twenty-one years old, had attended school to the eleventh grade, could read and write, and had prior experience with the criminal justice system for committing theft offenses. According to Detective Begeot, appellant did not appear to be under the influence of alcohol or drugs, nor did he seem sleepy or out of control. In fact, the videotaped interviews confirm that appellant understood Detective Begeot and Trooper Baron's questions, that he spoke freely, and appeared calm.
{¶ 165} As to appellant's mental condition, Investigator Teeple was informed by appellant that he had been in and out of several hospitals on suicide watch. However, upon reviewing the videotaped session with Investigator Teeple, it is evident that there was nothing unusual about appellant's emotional or mental state at the time of questioning.
{¶ 166} Appellant also takes issue with Trooper Baron advising him to tell his side of the story. Appellant seems to suggest that based onState v. Sewell (Sept. 14, 1990), 7th Dist. No. 89 C.A. 161, 1990 Ohio App. LEXIS 4071, such conduct amounted to "cajoled coercion" and deception to procure a statement.
{¶ 167} In Sewell, the Seventh Appellate District determined that a waiver and subsequent confession was involuntary when the police officer testified that in conjunction with the reading of the Miranda rights, he also advised the defendant that "it's better to have your side of the story known in case there is anything we missed, we can talk to those people." Sewell at 7. Upon consideration, the Sewell court held that such conduct amounted to "cajoled coercion":
 {¶ 168} "The appellant argues that the advice by the police officer that `* * * it's better to have your side known in case there is anything we missed * * *' * * * it amounts to cajoled coercion. We agree with the appellant. Police officers are duty bound to inform a defendant of his rights pursuant to Miranda. Police officers are required to ascertain that if a defendant waives those rights, he waives them knowingly. Relative to the Miranda rights, there should be nothing further. We agree with the appellant that the suggestion that there is always two sides to a case certainly engenders in the mind of the accused hope or fear in respect to the crime charged and unconsciously impels a defendant to make a statement." Sewell at 7-8.
{¶ 169} This court, however, is not persuaded by the decision rendered in Sewell because the Seventh Appellate District failed to apply the totality of the circumstances test. In fact, the Seventh Appellate District, itself, has criticized the Sewell opinion. See, e.g., State v.Brown, 7th Dist. No. 96 C.A. 56, 2001-Ohio-3175, 2001 Ohio App. LEXIS 380, at 15-16; State v. Burley (Aug. 11, 1998), 7th Dist. No. 93-CA-204, 1998 Ohio App. LEXIS 3895, at 19-20.
{¶ 170} While Trooper Baron told appellant that he was being given an opportunity to tell his side of the story, this was not improper. That is because "[a]dmonitions to tell the truth made by police officers are considered neither threats nor promises and are permissible." State v.Ashford (Feb. 16, 2001), 11th Dist. No. 99-T-0015, 2001 WL 137595, at 3 citing Loza at 67 and State v. Cooey (1989), 46 Ohio St.3d 20, 28.
{¶ 171} As for telling appellant that everything was going to be okay, we do not view this as being an improper interrogation tactic. When appellant began to cry, the officers were apparently trying to make appellant feel better, as one would try to do with any crying person. There is no evidence this was a calculated response designed to subvert appellant's will.
{¶ 172} Appellant further claims that when he was transported to Investigator Teeple's office for the polygraph examination, he only had about two hours of sleep the night before. However, according to Investigator Teeple, appellant explained that "he was tired but his eyes wouldn't close * * *." Thus, there was no claim that appellant had not been given the opportunity to sleep, only that he was unable to sleep. Furthermore, Investigator Teeple described appellant as alert and having good communication skills. Although appellant seemed tired during the videotaped session with Investigator Teeple, he communicated well and clearly understood the questions directed at him.
{¶ 173} Appellant also argues that with the psychological pressure of the polygraph test, the police officers convinced him to make an additional statement regarding his involvement in the murder of the Londons.
{¶ 174} As to this point, we note that no physical punishment or threats had been used, and appellant had not been deprived of any physical necessities, such as food and drink, or restroom facilities. The videotaped interrogations took place in short time periods where appellant was permitted to consume a soft drink, water, have bathroom breaks, and smoke cigarettes. Thus, we believe that under these interrogation conditions, there is no evidence to demonstrate that the suggestion to take a polygraph exam caused appellant's will to be overborne or impair his self-determination to the point where he involuntarily waived his Miranda rights and provided a statement.[5]State v. Chase (1978), 55 Ohio St.2d 237, at 247-248 (holding that a defendant's confession was not involuntary notwithstanding that two polygraph examiners told defendant he would not have to take the test if he had anything to hide, and when the examiners confronted defendant with the polygraph results they refused to let defendant speak to close friends unless he would first explain his answers to the polygraph examination); State v. Heyward (May 18, 1998), 4th Dist. No. 96CA42, 1998 WL 290238, at 7-8 (holding that a confession was not involuntary where defendant's confession was given near the end of a polygraph session which lasted approximately five hours); State v. Sidlovsky (July 10, 1996), 9th Dist. No. 95CA006253, 1996 WL 385606, at 5 (holding that a defendant's confession was voluntary even though defendant was advised by the detective that he might have to take a polygraph examination); Statev. Benson (Aug. 9, 1995), 4th Dist. No. 94 CA 36, 1995 WL 477520, at 5 (holding that the offer of a polygraph test as a way to ascertain the truth did not invalidate defendant's confession).
{¶ 175} In summation, under the totality of the circumstances, we conclude that appellant made a knowing, voluntary, and intelligent waiver of his constitutional rights, and that his statements to the law enforcement officials were voluntarily made. In fact, we agree with the trial court's statements that appellant's demeanor on the videotapes is not that of a person coerced or threatened. The videotapes quite plainly show that appellant was calm, communicated well, spoke freely, and voluntarily.
{¶ 176} The second issue advanced under the first assignment of error is that law enforcement created an unnecessary delay in bringing appellant before the court for an initial appearance, in violation of Crim.R. 4, and necessitates the exclusion of the December 20, 1999 statements made to Investigator Teeple during that time. According to appellant, the delay in bringing him to court for an initial appearance was unreasonable and was designed specifically to provide Investigator Teeple with an opportunity to secure a confession from him.
{¶ 177} As to this point, the trial court noted in its October 30, 2000 judgment entry that "[appellant] was arrested on Sunday afternoon [December 19, 1999] and appeared before this Court on Monday afternoon, on December 20, 1999. [Appellant] was brought before the Court approximately twenty-four (24) hours and no more than twenty-eight (28) hours after his initial arrest."
{¶ 178} Crim.R. 4(E)(1) sets forth the procedure to be followed after an arrest has been made pursuant to an arrest warrant. Specifically, Crim.R. 4(E)(1)(C)(iii) requires an arrested person to be brought before the court without unnecessary delay. However, "[the]failure to comply with this statute [Crim.R. 4(E)] does not automaticallyinvalidate a confession." (Emphasis added.) State v. Torres (Aug. 22, 1986), 6th Dist. No. WD-85-64, 1986 WL 9097, at 4. Rather, "[u]pon proper showing of prejudice in the form of a constitutional infringement," suppression of an incriminating statement may cure a Crim.R. 4(E) violation. State v. Sauceman (Aug. 22, 2000), 7th Dist. No. 99 CA 137, 2000 WL 1222228, at 3, citing State v. Hill, 64 Ohio St.3d 313, 321,1992-Ohio-43
{¶ 179} In the instant matter, we do not condone or endorse the delay in bringing appellant before the trial court until Monday afternoon. Nevertheless, even if this court were to find that the alleged delay was unnecessary and violated Crim.R. 4, appellant's statement still would not be suppressed based solely on that reason. This is because "[appellant's] rights arising under Crim.R. 4(E) were merely statutory, and not of fundamental constitutional dimensions * * *." State v. Wright
(Feb. 22, 1988), 2d Dist. No. 1189, 1988 WL 25910, at 2.
{¶ 180} In other words, "[e]ven if * * * the alleged delay was unnecessary and violated the statute, the statutory violation would not compel suppression of statement in the absence of any constitutionalinfringement." (Emphasis added.) Hill at 321, citing State v. Cowans
(1967), 10 Ohio St.2d 96. See, also, State v. Mackey (Feb. 18, 1982), 11th Dist. No. 1142, 1982 WL 5828, at 4 (holding that a violation of Crim.R. 4(E) does not constitute a violation of constitutional rights; therefore, the exclusionary rule cannot be applied). As discussed earlier, appellant's waiver of Miranda rights and subsequent statements were voluntarily made.
{¶ 181} In summation, Ohio has never held that a failure to comply with Crim.R. 4(E), by itself, is grounds for exclusion of statements made during the delay. To the contrary, this court has held in Mackey, supra, that "a confession, which is otherwise voluntary, is admissible despite the fact that defendant was not taken before a court for arraignment without unnecessary delay." (Emphasis added.) Id. at 4. See, also, UnitedStates v. Johnson (C.A.6, 2000), 2000 Ohio App. LEXIS 11872, at 18-20, certiorari denied (2000), 531 U.S. 1025; United States v. Christopher
(C.A.6, 1991), 956 F.2d 536, 538-539.
{¶ 182} Accordingly, we hold that a violation of Crim.R. 4(E) is an insufficient basis solely upon which to exclude appellant's statements when such were made voluntarily. Had law enforcement used the delay to conduct an improperly coercive interrogation, a court would be justified in suppressing the confession. Appellant's first assignment of error is, therefore, not well-taken.
{¶ 183} In assignment of error two, appellant contends that the trial court should have sua sponte suppressed two pieces of evidence: appellant's bloodstained tennis shoes and Dallas Cowboys jacket.
{¶ 184} At the outset, we note that our review of the record indicates that while appellant did file a motion to suppress, such motion did not seek suppression of the shoes and jacket. Further, at trial, defense counsel never objected to the admissibility of these items. Because defense counsel neither filed a motion to suppress nor objected to the admission of appellant's shoes or jacket at trial, we are limited to a plain error review.
{¶ 185} In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. State v. Long
(1978), 53 Ohio St.2d 91, paragraph three of the syllabus. Notice of plain error must be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.State v. D'Ambrosio, 67 Ohio St.3d 424, 437, 1993-Ohio-170; Long at paragraph three of the syllabus.
{¶ 186} In the instant matter, the trial transcript indicates that subsequent to appellant's arrest, Agent John Saraya ("Agent Saraya") seized appellant's shoes and jacket. By way of background, Agent Saraya is employed in the crime scene unit of the Bureau of Criminal Investigation and Identification ("the BCII"). His primary duties involve evidence identification and collection and investigative assistance. Prior to obtaining employment with the BCII, Agent Saraya was a police officer with the Liberty Township Police Department for nine years.
{¶ 187} At trial, Agent Saraya testified that on December 16, 1999, he was involved in processing the crime scene at the Londons' residence where he collected such evidence as blood and fingerprints, and took photographs. Agent Saraya remained actively involved in the London investigation by processing the stolen Crown Victoria on Friday, December 17, 1999. In doing so, he observed blood stains on the driver's side arm rest and found several weapons in the vehicle, including shotgun shells, pellet guns, a compound bow, and a box of arrows.
{¶ 188} Then, on December 18, 1999, Agent Saraya was present during Mrs. London's autopsy. The following morning, Sunday, December 19, 1999, Agent Saraya processed the second London vehicle, to-wit, the Pontiac Parisienne, which was abandoned in Mill Creek Park. Near the vicinity of the vehicle, Agent Saraya discovered a pellet gun, stained gloves, and a credit card belonging to Mr. London.
{¶ 189} Later that afternoon, Agent Saraya participated in the arrest of appellant. At that point, Agent Saraya was well aware that there was at least one violent and bloody homicide, and that one of the Londons' vehicles contained bloodstains. According to Agent Saraya, after appellant was handcuffed, he requested his shoes and indicated that they were in the bedroom. When Agent Saraya retrieved a pair of tennis shoes from the bedroom floor, appellant confirmed that those were, in fact, his shoes. While looking at these shoes, Agent Saraya noticed stains that appeared to be drops of blood.
{¶ 190} Agent Saraya also explained that when he went into the bedroom to retrieve appellant's shoes, a Dallas Cowboys jacket was next to the shoes. Agent Saraya asked appellant if this was his jacket, and he responded positively. In looking at the jacket, Agent Saraya observed some staining as well. As a result of these observations, Agent Saraya seized appellant's shoes and jacket.
{¶ 191} In light of the foregoing facts, we believe that this is a classic example of incriminating evidence found in plain view when Agent Saraya obtained lawful access to the bedroom pursuant to appellant's request and direction.
{¶ 192} There are two issues here; first, was this a plain view situation, and second, was this incriminating evidence "immediately apparent"?
{¶ 193} A police officer may seize evidence under the plain view exception to the search warrant requirement if "the initial intrusion leading to the item's discovery was lawful and it was `immediately apparent' that the item was incriminating." State v. Waddy (1992),63 Ohio St.3d 424, 442. See, also, State v. Kinley, 72 Ohio St.3d 491,495, 1995-Ohio-279; State v. Freeman, 11th Dist. No. 2001-T-0008, 2002-Ohio-1176, at ¶ 18; State v. Potts (Sept. 25, 1998), 11th Dist. No. 97-T-0038, 1998 WL 684158, at 2. "The `immediately apparent' requirement * * * is satisfied when police have probable cause to associate an object with criminal activity." State v. Halczyszak (1986),25 Ohio St.3d 301, paragraph three of the syllabus. "This association may arise from the character of the item itself or from the circumstances in which the item was found." Freeman at ¶ 18, citing Halczyszak at 304-305. Further, the probable cause must "`be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of arrest guided by his experience and training.'" (Citation omitted.) Freeman at ¶ 19.
{¶ 194} With respect to the first requirement, a lawful initial intrusion, it is clear from the record that the police officers, including Agent Saraya, had a right to be in the residence as they were seeking to arrest appellant pursuant to an arrest warrant for grand theft of a motor vehicle. Thus, the initial intrusion into the residence was lawful. Waddy at 442.
{¶ 195} However, appellant contends that he was arrested in a separate room away from the location of his shoes and jacket; thus, there was no justification to allow Agent Saraya to intrude into another room after appellant had already been handcuffed. We disagree.
{¶ 196} Contrary to appellant's contention, Agent Saraya was lawfully in the bedroom pursuant to appellant's request for his shoes. As we mentioned earlier in this opinion, appellant specifically asked for his shoes and indicated that they were in the bedroom. In other words, it was appellant who proposed the retrieval of his shoes from the bedroom. As such, Agent Saraya had the right to be in the bedroom where he observed appellant's shoes and jacket on the floor. Thus, the first requirement of the test has been satisfied.
{¶ 197} The second requirement, that the incriminating nature of the item was "immediately apparent," is also satisfied. As explained earlier, prior to the arrest of appellant, Agent Saraya had been extensively involved in the London murder investigation, and as a result, was very familiar with the case. For instance, he was aware that one of the two stolen vehicles had extensive blood stains. He was aware that the wife of the then missing second victim had suffered a bloody and violent death.
{¶ 198} Specifically, Agent Saraya explained that when he looked at the shoes, "[he] could see stains, what appeared to be drops of blood on them. * * *" "[T]here were stains on the shoes that appeared to [him] could have been blood. Stains across the tops that were visible to [him] and on the sides." Likewise, in looking at the jacket, Agent Saraya explained that "there appeared to be some staining on that, and we also collected that."
{¶ 199} Thus, we believe that Agent Saraya's previous involvement and knowledge of the case, and his experience in identifying and collecting evidence made it immediately apparent to him the incriminating nature of appellant's blood stained shoes and jacket.
{¶ 200} In summation, appellant's jacket and shoes were in open view and their incriminating nature was immediately apparent to Agent Saraya in light of his prior involvement in this case. To disregard these items until a search warrant could be obtained would have been impracticable. The apartment where appellant was arrested belonged to his friend. As a result, these items could have easily been hidden or destroyed if left unguarded. Therefore, we hold that there was probable cause as to the incriminating nature of these plain view items. As a result, the immediate seizure of these items was not unreasonable, and a search warrant was not necessary.
{¶ 201} Accordingly, we determine that there was no error, plain or otherwise, in the trial court's failure to sua sponte suppress the jacket and shoes. The second assignment of error is, therefore, meritless.
{¶ 202} The third assignment of error concerns alleged inflammatory evidence and improper comments made by the prosecuting attorney. Appellant believes that the prosecuting attorney "engaged in a pattern of conduct intended to make [him] look `evil' in the eyes of the jury while raising the passion of the jury for the victims [sic] family."
{¶ 203} Because appellant presents several issues challenging the admissibility of various exhibits, testimony, and comments by the prosecuting attorney as being prejudicial, we will address each one in turn.
{¶ 204} First, appellant takes issue with the state presenting Carol and Paul, the victims' adult children as witnesses. Appellant submits that Carol and Paul's testimony was akin to a victim impact statement, which has been held to be inadmissible because it, or similar evidence, is irrelevant and inflames the passions of the jury. State v.Broom (1988), 40 Ohio St.3d 277, 289. See, also, State v. White (1968),15 Ohio St.2d 146, 151. According to appellant, the core of their testimony centers on the terrible event of the discovery of their parents. Although the prosecuting attorney attempted to have these witnesses establish other evidentiary points, appellant suggests that most of those points were either not an issue or could have been established or were established by other witnesses. This included the fact that Burrows was a neighbor, the list of missing weapons, and the similarity of the steak knives.
{¶ 205} Given that defense counsel did not object to the testimony of Carol and Paul, we will apply the plain error rule. For the following reasons, we do not agree that Carol's and Paul's testimony was wholly irrelevant or cumulative in nature.
{¶ 206} At the outset, Carol briefly testified to such things as what her father did for a living, his involvement in the military, her relationship with her parents, and how they babysat the grandchildren. Although this information bears no significance to the state's case, it was relatively short and unemotional.
{¶ 207} Both Carol and Paul mentioned during their testimony that they spent time at their parents' house. This was relevant in establishing their familiarity with the house and items contained therein. For instance, Paul confirmed that his parents had a Crown Victoria and a Pontiac Parisienne, and that he had a list of the guns kept in the home. At trial, Paul was able to identify a number of weapons, including a compound bow and arrows, as belonging to his father.
{¶ 208} Paul also explained how on July 15, 2000, he went to the Hubbard Township Police Department to pick up his parent's vehicles. While cleaning the Pontiac, Paul discovered a serrated steak knife behind the front passenger seat and a knife sheath underneath the driver's seat. At trial, Paul identified the knife and sheath found in the Pontiac.
{¶ 209} Carol also confirmed that her parents stored weapons in the gun cabinet, and that she was familiar with the cutlery knives kept in the house. During her testimony, Carol identified a picture showing a steak knife missing from her parents' kitchen drawer. Carol was familiar with the knife set because she bought it for her parents, and had seen the complete knife set in the house prior to the murders. When Carol compared the knife that was in the kitchen to that found in the Pontiac, she opined that the knives were similar. She also identified a 100th Division POW watch as belong to her father, which was found in the Crown Victoria.
{¶ 210} Moreover, because Carol and Paul visited with their parents often, they were familiar with their neighbors. As such, both witnesses confirmed that Burrows lived next door to the parents.
{¶ 211} As for Mr. London's wallet, Paul explained that in January or February 2000, he received a package in the mail containing his father's wallet. During their testimony, Carol and Paul identified their father's wallet, the contents therein, and confirmed that he carried at least $100, along with credit cards. This testimony was relevant to establish how Mr. London's wallet was eventually discovered and corroborated that appellant obtained cash and a credit card from Mr. London's wallet.
{¶ 212} Additionally, both Carol and Paul discussed when they last saw their parents alive, how they unsuccessfully attempted to contact their parents by telephone on Thursday, December 16, 1999, and how they later learned upon arriving at the house that their mother was deceased and their father was missing. Again, we view this testimony as relevant in helping the jury understand how and when the London murders were discovered. Further, the testimony as to these events was relatively short and unemotional. In fact, neither Paul nor Carol testified as to the impact of learning of their parent's death.
{¶ 213} In summation, we believe that Carol and Paul's testimony was brief, unemotional and, as a whole, relevant in assisting the jury in understanding how the investigation began, their subsequent involvement in the investigation, and their ability to identify items as their parent's property. Any references to their parent's background or their relationship was minimal and unemotional. Accordingly, the testimony's relevance was not outweighed by its prejudicial effect, if any. See, e.g., State v. Broom (1988), 40 Ohio St.3d 277, 289. Thus, it was not plain error to admit Carol and Paul's testimony.
{¶ 214} In the second issue presented under the third assignment of error, appellant contends that the prosecuting attorney inflamed the jury by introducing unnecessary photographs from the recovery of Mr. London's body from the Mahoning River and subsequent autopsy photographs of Mr. and Mrs. London, to wit: state Exhibits 130-133, 170-177 and 180-187. According to appellant, these exhibits offered no probative value on any issue or element of the state's case and were presented to the jury solely to produce a reaction of disgust, hatred, and revenge. Appellant also seems to suggest that this evidence was cumulative in nature because the state had "an arsenal of evidence[,]" including the videotaped statement of appellant documenting his actions and the testimony of the investigating officers and the medical examiner.
{¶ 215} "The admission of photographs and other similar evidence rests within the sound discretion of the trial court and its ruling on this matter will not be disturbed on appeal absent an abuse of discretion and a clear showing of prejudice to the defendant." State v. Noling (June 30, 1999), 11th Dist. No. 96-P-0126, 1999 WL 454476, at 22.
{¶ 216} At trial, defense counsel objected to state's Exhibits 170-177 and 180-187 as being unduly inflammatory and having no evidentiary value. As such, we will apply the abuse of discretion standard to those exhibits. However, we will review state's Exhibits 130-133 pursuant to the plain error rule because no objections were entered by defense counsel as to the admissibility of those exhibits.
{¶ 217} As to the admission of photographic evidence, the Supreme Court of Ohio in State v. Maurer (1984), 15 Ohio St.3d 239, set forth the following evidentiary standard for the introduction of photographic evidence in capital cases:
 {¶ 218} "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." Id. at paragraph seven of the syllabus.
 {¶ 219} "[T]he mere fact that a photograph is gruesome or horrendous is not sufficient to render it per se inadmissible[,]" nor is a photograph automatically rendered inadmissible because the accused stipulates to the cause of death. Id. at 265.
{¶ 220} As part of its case-in-chief, the state presented the testimony of Detective Begeot, the lead investigator in the London murders. During his testimony, Detective Begeot identified state Exhibits 130-133 and 170-177: Exhibit 130, a photograph taken by Agent Saraya on December 23, 1999 of the Mahoning River where Mr. London's body was recovered; Exhibit 131, a photograph taken by Agent Saraya of the T-shirt wore by Mr. London covered in blood with the phrase "I love Grandpa" and a picture of a child on the front of the shirt; Exhibit 132, a photograph taken by Agent Saraya of a button down shirt worn by Mr. London covered in blood; Exhibit 133, a photograph taken by Agent Saraya of Mr. London's button down shirt, left breast pocket, with a multitude of holes confined to that area; Exhibit 170, a photograph taken on December 23, 1999 by Agent Saraya of Mr. London's body recovered from the Mahoning River pictured from the waist up and clothed with a T-shirt and button down shirt; Exhibit 171, a photograph of Mr. London's neck area showing a slashing-type wound to the throat; Exhibit 172, a photograph taken by Agent Saraya at the morgue of Mr. London unclothed from the chest up where numerous stab wounds are located; Exhibit 173, a photograph of Mr. London's face with several pellet wounds to his forehead; Exhibit 174, a photograph of the right side of Mr. London's face evidencing several pellet wounds; Exhibit 175, a photograph taken by Agent Saraya depicting Mr. London's left side of his body from the shoulders down to the hips, with numerous stab wounds visible; Exhibit 176, a close-up of the left side Mr. London's body with stab wounds; Exhibit 177, a photograph of Mr. London's back from the neck to the hips where several stab wounds were visible.
{¶ 221} As an aside, we note that during his testimony, Detective Begeot indicated that he was present when Exhibits 130-133 and 170-177 were photographed by Agent Saraya either at the Mahoning River or during Mr. London's autopsy.
{¶ 222} Moving on to state's Exhibits 180-187, these photographs were presented during the testimony of Agent Saraya, who was present during Mrs. London's autopsy on December 18, 1999: Exhibit 180, a photograph of Mrs. London at the morgue still clothed; Exhibit 181, a photograph of Mrs. London's bra, bloodstained with two holes in the fabric; Exhibit 182, a photograph of Mrs. London's shirt heavily bloodstained with multiple holes; Exhibit 183, a photograph of Mrs. London's left side showing multiple stab wounds; Exhibit 184, a close-up of Mrs. London's left shoulder where she sustained numerous stab wounds; Exhibit 185, a photograph of Mrs. London's left breast with several stab wounds; Exhibit 186, a photograph of Mrs. London's left hand with an abrasion below the wrist; Exhibit 187, a close-up of Mrs. London's neck behind her left ear evidencing a stab wound.
{¶ 223} The state also presented the testimony of Dr. Humphrey D. Germanick ("Dr. Germanick"), the medical examiner who performed the autopsies on Mr. and Mrs. London. During his testimony, Dr. Germanick explained in much detail that Mrs. London sustained 34 stab wounds and 4 incision abrasions. Further, there was evidence that Mrs. London was restrained. As to Mr. London, Dr. Germanick testified that 28 stab wounds were inflicted and there were multiple broken ribs and 6 pellet wounds to the face. From these facts, the jury could have concluded that Mr. London actively resisted his killers.
{¶ 224} Upon considering the trial transcript, we determine that the exhibits appellant now challenges were probative in helping the jury understand Dr. Germanick, Detective Begeot, and Agent Saraya's testimony, and assisted the jury in deciding whether the murders were committed with either prior calculation or purposely. As such, the photographs were relevant and not cumulative in nature. Therefore, since the probative value of the photographs outweigh the danger of unfair prejudice and illustrated the testimony presented at trial, there was no error, plain or otherwise, in admitting these exhibits.
{¶ 225} Third, appellant seems to challenge the trial court's denial of two separate motions for mistrial concerning evidence presented at trial that appellant and his companion Burrows visited a Taco Bell restaurant on the night of the murders. According to appellant, the intent of the prosecuting attorney in introducing two Taco Bell receipts was to suggest to the jury that he had worked up an appetite. Appellant also seems to take issue with the denial of defense counsel's motion for a mistrial when Investigator Teeple testified that appellant had admitted to the premeditated murder of Mrs. London.
{¶ 226} It is within the sound discretion of the trial court to grant or deny a motion for mistrial. State v. Garner, 74 Ohio St.3d 49,59, 1995-Ohio-168. An appellate court will not disturb the decision of the trial court absent a showing that the accused has suffered material prejudice. State v. Sage (1987), 31 Ohio St.3d 173, 182. "Moreover, mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." Garner at 59.
{¶ 227} Although the motions for mistrials were denied, the trial court remedied the situation in other ways. Our review of the trial transcript shows that when the prosecuting attorney made the comment that "the Pontiac got a little more to eat," the trial court sustained defense counsel's objection. Likewise, when Investigator Teeple stated that appellant admitted to the premeditated murder of Mrs. London, defense counsel moved to strike the statement. In response, the trial court instructed the jury to disregard Investigator Teeple's statements that "[appellant] admitted to the premeditated murder of Mrs. London."
{¶ 228} Furthermore, any harm resulting from the above comments were also remedied by the trial court's jury instruction as to sustained objections and stricken testimony:
 {¶ 229} "Statements or answers that were stricken by the Court or which you were instructed to disregard are not evidence and must be treated as though you never heard them. You must not speculate as to why the Court sustained the objection to any question or what the answer to such question might have been."[6]
{¶ 230} Accordingly, the trial court did not err in denying defense counsel's motions for mistrial.
{¶ 231} In the last issue presented under the third assignment of error, appellant challenges certain statements made by the prosecuting attorney during his closing argument, suggesting prosecutorial misconduct. According to appellant, the prosecuting attorney told the jury that the family went through "living hell" in the discovery of their mother and father, and also commented on appellant's credibility:
 {¶ 232} "I want to go through the different faces of Mark Worley. That can been seen with a recognition that people who are in trouble, who have a lot to lose, and the Judge would instruct you and I believe I'm certain will tell you, that you consider the interest or bias of any particular witness. That is, if you got an interest in the outcome when you give a statement, common sense tells you you may have a reason to lie or not tell the truth. * * * These poor victims were not found for hours. The family went through living hell in the discovery of their mother and father while [appellant is] out playing around picking up women and having a great time in their car and with their money."
{¶ 233} During closing arguments, defense counsel failed to object to this portion of the prosecuting attorney's closing argument. As such, plain error analysis control and "permits reversal only to prevent a manifest miscarriage of justice." State v. Mills (1992), 62 Ohio St.3d 357,373.
{¶ 234} "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Smith, 87 Ohio St.3d 424, 442,2000-Ohio-450. The focus "is the fairness of the trial, not the culpability of the prosecutor." Id., citing Smith v. Philips (1982),455 U.S. 209, 219. "Thus, prosecutorial misconduct is not grounds for reversal unless it so taints the proceedings that a defendant is deprived of a fair trial." Foster at 11, citing Smith, 87 Ohio St.3d 424, 442.
{¶ 235} After reviewing the prosecutorial comments of which appellant complains, we cannot conclude that any of them prejudicially affected appellant's substantial rights. Although appellant did not testify at trial, his videotaped statements were played to the jury. A review of those videotaped statements support the prosecuting attorney's claim that appellant lied.
{¶ 236} For instance, prior to making incriminating statements to Detective Begeot and Investigator Teeple, appellant initially denied any involvement in the London murders, withheld the extent of his involvement in Mrs. London's murder, and denied attempting to use Mr. London's credit card.
{¶ 237} However, the prosecuting attorney's comment that the family went through a living hell in discovering their parents certainly has no relevance in determining appellant's guilt and can serve only to inflame the jury. Despite the impropriety in the prosecuting attorney's "living hell" comment, this did not materially prejudice appellant. As will be explained in our manifest weight of the evidence analysis in the fifth assignment of error, the strength of the evidence against appellant weighs against a conclusion that he was prejudiced by any of the prosecuting attorney's comments.
{¶ 238} Finally, we note that any potential error here was cured by the trial court's instruction to the jury that statements and arguments made by the attorneys are not evidence. Furthermore, the trial court cautioned the jury not to be influenced by sympathy or prejudice:
 {¶ 239} "You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all of the disputed questions of fact, to apply the instructions of law of the Court to your findings and render you verdicts accordingly. In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all of the evidence and make your findings with intelligence and impartiality and without bias, sympathy, or prejudice so that both the State of Ohio and Mark Worley will feel that this case was fairly and impartially tried."
{¶ 240} In summation, we believe that appellant received a fair trial, and his third assignment of error is without merit.
{¶ 241} In the fourth assignment of error, appellant argues that he was denied effective assistance of counsel because his trial attorneys "failed to object to improper evidence and failed to make a proper record for purposes of preserving Appellant's rights on appeal." According to appellant, "there was a mountain of character evidence that was brought in without trial counsel's objection. There is no legitimate tactical basis for allowing improper character evidence to be presented to the jury. Even where an objection was made, it was done infrequently and without preserving arguments for appeal."
{¶ 242} Appellant, however, has failed to provide any citations to specific portions of the record on which he relies to advance his argument that character evidence was improperly admitted during trial. Specifically, App.R. 16(A)(7) requires appellant's brief to include citations to parts of the record upon which he relies in making his argument. A reviewing court may "disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based * * * as required under App.R. 16(A)." App.R. 12(A)(2). Hence, App.R. 12(A)(2) and App.R. 16(A)(7) permits this court to disregard an assignment of error which is not supported by pertinent parts of the record. State v. Perry
(May 2, 1997), 11th Dist. No. 96-T-5428, 1997 WL 269158, at 6.
{¶ 243} In the instant case, we are unable to predict what improper character evidence appellant is referring to. This is because appellant has failed to point to specific "errors" in the record to support his vague statement that "there was a mountain of improper character evidence that was brought in without trial counsel's objection." Appellant has left it to this court to wade through volumes of transcripts and attempt to construct a legal argument on his behalf. "It is not the duty of this court to search the record for material or locate authority to support an alleged error. Such an expedition would amount to a utilization of this court's resources on an exercise that was appellant's responsibility to complete, and would be manifestly unfair to the opposing parties." Cominsky v. Malner (Dec. 29, 2000), 11th Dist. No. 98-L-242, 2001 WL 20551, at 5.
{¶ 244} Additionally, the state's answer brief points out that appellant had failed to comply with App.R. 16(A)(7); however, appellant's counsel elected not to file an amended or a reply brief containing a reference to the specific portion of the record where improper character evidence was allegedly admitted during trial. For these reasons, appellant's claim that he was denied effective assistance of trial counsel because improper character evidence was introduced is without merit.
{¶ 245} Next, appellant submits that his trial attorneys were ineffective because they failed to challenge the admissibility of his jacket and shoes. In light of our holding in the second assignment of error that Agent Saraya properly seized these items pursuant to the plain view exception to the search warrant requirement, we hold that appellant has not met his burden of proving that his trial attorneys violated an essential duty by failing to challenge the admissibility of his jacket and shoes, or that he was prejudiced by any ineffectiveness. As such, we are convinced that appellant received competent representation, and his fourth assignment of error is not well-taken.
{¶ 246} In the fifth and final assignment of error, appellant maintains that his convictions are against the manifest weight of the evidence. According to appellant, "[b]ased on the lack of evidence presented by the state in this case, the only conclusion is that the jury lost its way and that the conviction was a result of a miscarriage of justice. This was due in part by the improper prosecutorial tactic of using other crimes, wrongs and acts and inflaming the passions of the jury."
{¶ 247} Again, appellant fails to provide citations to specific portions of the record on which he relies to advance his manifest weight argument. Despite the failure to comply with App.R. 16(A)(7), given the severity of the charges involved in this case, we will consider whether appellant's convictions were against the manifest weight of the evidence.
{¶ 248} When reviewing a claim that the judgment was against the manifest weight of the evidence, we must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. State v. Martin (1983),20 Ohio App.3d 172, 175. See, also, State v. Thompkins (1997),78 Ohio St.3d 380, 387; State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 16.
{¶ 249} In order for an appellate court to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Thompkins at 387.
{¶ 250} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175. The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. Thompkins at 390 (Cook, J. concurring).
{¶ 251} According to defense witness Shawn Holler ("Mr. Holler"), he was in the county jail when he overheard Burrows "bragging about committing a murder, how he stabbed this old lady and then he said he had a partner and he told, he was saying that he forced him to do it also because he wasn't going down for this alone." Mr. Holler also overheard Burrows bragging about Mr. London's death, but emphasized that Burrows did not mention who killed Mr. London:
 {¶ 252} "Q. Who does Mr. Burrows say killed Mr. London?
{¶ 253} "A. He doesn't really say."
{¶ 254} Although appellant denied killing Mr. London, he admitted to luring the seventy-five year old man out of his home to a set of railroad tracks near Mt. Everett, was present when the murder occurred, and placed Mr. London's body in the trunk of the Pontiac. Afterwards, appellant went to the West Avenue Bridge, removed Mr. London's body from the trunk of the Pontiac, and hurled his body into the Mahoning River.
{¶ 255} Appellant later abandoned the Pontiac in Mill Creek Park. In the vicinity of the vehicle, appellant scattered his pellet gun, a pair of white bloody gloves, a serrated steak knife, and Mr. London's credit card. No blood was detected on the knife found in Mill Creek Park. However, Mr. London's DNA appeared on appellant's shoes and on the sheath recovered from the Pontiac.
{¶ 256} Furthermore, Dr. Germaniuk opined that the serrated knife recovered from the Pontiac and/or the serrated knife found in Mill Creek Park could have been used to inflict the stab wounds on Mr. London.
{¶ 257} As for Mrs. London, appellant returned to the residence to kill the seventy-four year old woman because she could identify him and Burrows. While in the home, appellant took a serrated steak knife from the kitchen, restrained Mrs. London in the bathroom, muffled her screams while Burrows stabbed her, and then stabbed Mrs. London several times himself.
{¶ 258} Appellant's jacket and the serrated steak knife recovered from the Pontiac contained the DNA of Mrs. London. According to Dr. Germaniuk, two knifes could have been used to inflict the wounds on Mrs. London; that is, a serrated steak knife and a hunting knife. During his interview with Investigator Teeple, appellant drew a picture of a 10 or 10-1/2 inch knife he claimed Burrows had in his possession.
{¶ 259} Appellant also admitted to removing weapons from the Londons' residence, taking cash from Mr. London's wallet, and attempting to use Mr. London's credit card at an ATM machine.
{¶ 260} After reviewing the record, we cannot conclude that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial. The previous discussion highlights that the jury had compelling evidence placing appellant at the scenes of the murders and demonstrating that he participated in the crimes. Appellant was not denied a fair trial and the claimed errors do not call into question the validity of the verdict. Therefore, appellant's convictions are not against the manifest weight of the evidence, and the final assignment of error has no merit.
{¶ 261} Based on the foregoing analysis, appellant's five assignments of error are meritless, and the judgment of the trial court is affirmed.
ROBERT A. NADER, J. concurs, WILLIAM M. O'NEILL, P.J, concurs in judgment only.
[1] This court upheld Burrow's conviction in State v. Burrows, 11th Dist. No. 2000-T-0089, 2002 Ohio 1961.
[2] The time recorded on the videotape indicates that the interview began at 5:45 p.m. However, according to Detective Begeot, the clock had not been re-set to reflect the end of day-light savings time.
[3] According to appellant, Mr. London had $200 in his wallet, which he and Burrows had split.
[4] {¶ a} The consent form stated the following:
 {¶ b} "I Mark Worley hereby consent to having the Hubbard Township Police Department transport me to site where Charles London was killed and where his body was disposed of.
 {¶ c} "Further I have been told that I do not have to do this and I am doing this of my own free will. No person of the Hubbard Township Police Department or any other Law Enforcement Agency have made any promises to me.
 {¶ d} "Additionally, no person has coerced or threatened me in any way to gain my compliance in this act."
[5] {¶ a} The following exchange took place between Detective Begeot and appellant as to whether appellant was willing to submit to a polygraph examination:
 {¶ b} "Detective Begeot: * * * [I]f you would be asked to take a polygraph exam, possibly tomorrow just to be sure and confirm everything that you are telling us is truthful, would you be willing to do that for us?
{¶ c} "[Appellant]: Yes, I would.
 {¶ d} "Detective Begeot: You have no objections for that whatsoever.
{¶ e} "[Appellant]: No, I don't."
[6] As such, we note that a jury is presumed to follow the instructions given to it by the trial court. State v. Jones, 91 Ohio St.3d 335, 353,2001-Ohio-57; Foster at 11.